## THE NO. 25.

(Circuit Court of Appeals, Second Circuit.    April 6, 1920.)

No. 72.

1. **Collision** ⟠100(2)—**Steam vessels meeting in fog; failure to observe rules.**

A collision on Hudson river in a dense fog, between a steamship going down and a car float alongside a tug passing up, *held* due solely to the fault of the steamship in failing to go at moderate speed and to stop her engines on hearing the fog signals of the tug somewhere ahead, as required by article 16 of the Inland Rules (Comp. St. § 7889); the tug having obeyed such rule by stopping her engines at once on hearing the fog signals of the steamship.

2. **Collision** ⟠104—**Violation of rule raises presumption of liability.**

When a vessel disregards a rule of navigation, she has the burden of showing that her disobedience did not contribute to the injury which followed.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty for collision by the Booth Steamship Company, Limited, owner of the steamship Denis, against the New York Central

tug No. 25; New York Central Railroad Company, claimant. Decree for respondent, and libelant appeals. Affirmed.

The libelant is a corporation existing under the laws of the kingdom of Great Britain and Ireland.

Haight, Sandford, Smith & Griffin, of New York City (Henry M. Hewitt, and James McKown, Jr., both of New York City, of counsel), for appellant.

Harrington, Bigham & Englar, of New York City (T. Catesby Jones, of New York City, of counsel), for appellee.

Before WARD, ROGERS, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. This is a collision case, and the court below dismissed the libel. The libel was filed to recover damages sustained by the Booth Steamship Company, Limited, as owner of the steamship Denis, against the New York Central tug No. 25.

[1] On January 15, 1918, the steamship Denis left Hoboken at 9:30 a. m. bound for Brooklyn to take on cargo. She had been in dry dock undergoing repairs and was light. The vessel was assisted out into the river by two tugs, which stayed with her until she got into midstream, and was proceeding down the Hudson river under her own steam, at full speed, and in charge of a pilot. The wind was light, and was blowing from the north, the tide was running strong flood, and the weather was hazy; there being patches of fog coming from the ice drifting in the river.

The steamship ran into a patch of fog when about in the vicinity of Twenty-Third street, when she was slowed down until the fog lifted, and then proceeded again at full speed. A short time later she ran into another patch of fog, and was again slowed down, until she was barely stemming the tide. The fog whistles were blown at regular intervals. The story of the steamship is that, shortly after entering this second patch of fog, a signal from a tow ahead was heard off the starboard side of the steamship, and the helm was put slightly to starboard. The fog had closed in so quickly that evidently the fog whistles of the vessels in the vicinity were all started about the same time, and the sound of whistles came from all over. The fog signal from the tow ahead was heard several times, and when it had drawn closer the engines of the steamship were stopped, and shortly thereafter New York Central tug No. 25, with a car float on either side, loomed up out of the fog off the starboard bow of the steamship. The steamship's engines were immediately put full speed astern, three blasts of the whistle were blown, and the wheel put to port; but the latter action had little or no effect, as the steamship lacked speed enough to give her steerage way. The tug and car floats came on, and the car float on the port side of the tug struck the starboard side of the stem of the steamer, doing considerable damage to the steamship, and breaking the lines between the port car float and the tug.

The No. 25 left the terminal of the Long Island Railroad at Long Island City about 8:30 a. m., with the New York Central float No. 15 on her port side and the New Haven car float No. 39 on her starboard

side, bound for Weehawken, N. J. Both car floats were loaded with cars. The tug rounded the Battery and proceeded up the Hudson river. When below Pier 10 fog set in, and the speed of the tug was at once reduced to half speed. When near Chambers street fog whistles, consisting of one long and two short blasts, were blown at regular intervals, and the lookout was stationed on the car float. The story of No. 25 is that about this time the fog whistle of a steamer was heard up the river. The engines of No. 25 were immediately stopped, and a sharp lookout was kept for vessels. The fog whistles of a steamer were heard several times, and indicated to those in charge of the navigation of the tug that a steamer, which subsequently proved to be the Denis, was approaching from about a point off the port bow.

It appears that at 10:05 the engines of the Denis were slowed down to half speed ahead in consequence of running into a patch of dense fog. At 10:06 her speed was increased to full speed ahead, and she began blowing her fog signal. At 10:24 her speed was again reduced to half speed, after hearing forward of her beam a fog whistle, consisting of one long and two short blasts. The loom of a tug with car floats on either side, which subsequently proved to be the New York Central tug No. 25, was then seen by those aboard the Denis about a point on the steamer's starboard bow.

It appears from the log of the Denis that the loom of No. 25 and her tow was observed at 10:27, and at 10:29 the bow of the Denis came into collision with one of the floats which the No. 25 had in tow; the respective points of contact being the inboard forward corner of the port car float and the starboard side of the stem of the steamship.

We are satisfied that the blame for this collision rests on the Denis, in that it violated article 16 of the Inland Rules, which reads as follows:

"A steamship hearing, apparently forward of her beam, the fog signal of a vessel, the position of which is not ascertained, shall, so far as the circumstances of the case admit, stop her engines and then navigate with caution until the danger of collision is over."

The rule was made a part of the international code adopted by Act of Congress of August 19, 1890, 26 Stat. 320 (Comp. St. § 7837 et seq.). It became effective on July 1, 1897, by the President's proclamation. 29 Stat. 885. It was adopted to prevent collisions at sea. But Congress has also made the rule applicable for harbors, rivers, and inland waters by the Act of June 7, 1897, 30 Stat. 99, U. S. Comp. Stat. § 7889.

In Lie v. San Francisco & Portland Steamship Co., 243 U. S. 291, 296, 37 Sup. Ct. 270, 272 (61 L. Ed. 726) the court, commenting upon rule 16, said:

"The most cursory reader of this rule must see that while the first paragraph of it gives to the navigator discretion as to what shall be 'moderate speed' in a fog, the command of the second paragraph is imperative that he shall stop his engines when the conditions described confront him. The difficulty of locating the direction or source from which sounds proceed in a

fog renders it not necessary to dwell upon the purpose and obvious wisdom of this second paragraph of the rule."

In the Chattahoochee Case, 173 U. S. 540, 548, 19 Sup. Ct. 491, 494 (43 L. Ed. 801), in considering what constitutes moderate speed, the court said:

"No absolute rule can be extracted from these cases. So much depends upon the density of fog and the chance of meeting other vessels in the neighborhood that it is impossible to say what ought to be considered moderate speed under all circumstances. It has been said by this court, in respect to steamers, that they are bound to reduce their speed to such a rate as will enable them to stop in time to avoid a collision after an approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law."

In The Umbria, 166 U. S. 404, at page 417, 17 Sup. Ct. 610, at page 615 (41 L. Ed. 1053), the court, after reviewing the English and American cases, said:

"The general consensus of opinion in this country is to the effect that a steamer is bound to use only such precautions as will enable her to stop in time to avoid a collision, after the approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law. In a dense fog this might require both vessels to come to a standstill, until the course of each was definitely ascertained. In a lighter fog it might authorize them to keep their engines in sufficient motion to preserve their steerageway."

The subject was elaborately considered recently by the Circuit Court of Appeals in the First Circuit in The Sagamore, 247 Fed. 743, 159 C. C. A. 601. In The Lepanto (D. C.) 21 Fed. 651, 659, Judge Addison Brown said:

"Just at what point a steamer in a fog, on hearing another's whistle, is bound to stop and reverse, or how the master is to know when that is 'necessary' under the rule, is, to some extent, doubtless, a question of practical judgment. A steamer is not bound to stop and reverse at once, without reference to how distant the whistle may be, or may appear to be. Where the whistle is certainly distant, and no danger can be incurred by delay, immediate stopping is certainly not necessary; but if it be near, or appear to be near, she is bound, at her peril, to do so. The Frankland, L. R. 4 P. C. 529, 534; The Kirby Hall, 8 Prob. Div. 71. If uncertain, she must slacken, or stop and reverse. The George D. Fisher, 21 How. 1, 6; Peck v. Sanderson, 17 How. 178, 181. For her conduct in this respect a vessel must, prima facie, be held to answer according to the event. It is always safe to stop and reverse; at least, as regards the charge of fault. If she does not stop and reverse, when it is shown by the event that by doing so the collision might have been avoided, she must establish a clear justification for her course or be condemned. The Khedive and The Voorwarts, 5 App. Cas. 876, 890, 908. 'The rules are applicable from the time the necessity for precaution begins, and continue so long as the means and opportunity to avoid danger remain.' New York, etc., v. Rumball, 21 How. 372, 384. The whistles, or horns with mechanical appliances, required by the new regulations (article 12), are designed to make it certain that the signals shall be heard at a sufficient distance to render it possible in all cases for steamers to be stopped before coming in collision, if both vessels observe the rules, and have been previously going at 'moderate speed'; and no steamer's speed can be held 'moderate' that does not admit of her coming to a full stop within her share of the distance that separates her from another, after the latter's whistle is audible."

The Denis, as clearly appears, did not "go at a moderate speed" through the mist and fog as the rule requires, but proceeded at full

speed until the fog signals of the No. 25 were heard. The master of the Denis testified that after he heard the whistle from the tug forward of the beam of his boat he continued ahead without stopping his engines, and that he did not stop his engines until he saw the loom of the floats. The following is an excerpt from the record:

"Q. You did not stop your engines when you heard the whistles of this tug ahead of you? A. Not at once.

"Q. And you heard the whistles several times before you stopped? A. I couldn't say how many times we heard those particular whistles, there were so many around.

"Q. Don't you know the rules provide that when you hear a fog whistle of a steamer forward of your beam that you must stop your engines? A. I do not know what the rule in New York Harbor is, inland navigation.

"Q. Don't you know that that same rule is one of the International Rules? A. No; I have a local pilot in the port; I am guided by him.

"Q. Don't you know that it is the same rule on the high seas as in New York Harbor that prevails? A. The rule states that nothing in these rules shall interfere with any special authority given in inland navigation."

The evidence shows on the other hand that tug No. 25 obeyed the rule, and that she stopped her engines the moment the signals of the steamship were heard ahead of her beam. Her captain testified as follows:

"Q. How long had you been sounding your fog whistle when you heard the fog whistle of the steamer? A. Why, I should suppose about three or four minutes; I blew my whistle quite a long while before I heard his.

"Q. Before you began to blow the fog whistles I presume you were going full speed ahead? A. No, sir; we were traveling under slow bell.

"Q. When did you start with a slow bell? A. Off Pier 10, North River.

"Q. Why did you do that? A. I took the precaution in running into a fog.

"Q. Was it as far down as Pier 10 that the fog began to set in? A. No, sir; it was hazy, but not but what you could see quite a distance on both sides. * * *

"Q. So you continued under a slow bell from off Pier 10 until somewhere about Pier 20, or a little above, and then you heard the whistle or a fog whistle of a steamer dead ahead? A. Yes, sir.

"Q. So that when you heard the whistles your engine was stopped? A. Yes, sir.

"Q. Why did you stop them and when? A. We stopped our engines down off the ferry—the Erie Ferry—just as soon as I heard the fog whistle ahead."

That the Denis was in fault, and that the tug was not in fault, appears beyond doubt.

[2] When a vessel disregards a rule of navigation, she has the burden of showing that her disobedience did not contribute to the injury which followed. The Supreme Court stated the rule in The Pennsylvania, 19 Wall. 125, 136 (22 L. Ed. 148), as follows:

"The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing, not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute."

The burden of proof which rested on the Denis has not only not been met, but the evidence indicates that, if she had stopped when she merely slowed, the collision would not have happened.

Decree affirmed.