## THE NIAGARA.

### STAHL et al. v. THE NIAGARA.

### JOHNSON et al. v. SAME.

#### (District Court, S. D. New York. November 5, 1896.)

1. COLLISION AT SEA—STEAM AND SAIL—FOG—EXCESSIVE SPEED—INSUFFICIENT FOG HORN—DAMAGES DIVIDED.

The steamship Niagara, bound for Havana, came in collision in dense fog off the coast of Virginia with the bark Hales, bound north. The signals of each were not heard by the other in time to avoid collision; the steamer was making 8 to 10 knots, ¾ of full speed, and for this speed was held liable. On the evening previous to the collision, when the fog arose, the bark's mechanical fog horn on examination was found to give an unsatisfactory sound, and a mouth horn was used instead. The mechanical horn had not been used or examined since the departure of the bark for Cuba, nor since she left Philadelphia on her outward trip: Held, that the horn must be regarded as insufficient at the time the bark sailed from Cuba, and that the latter was, therefore, in fault for not giving the mechanical signals required by law; the need of additional provision, either by means of repair on board, or of a spare horn at the start, in order to enable the vessel to give the required signals throughout the voyage, considered.

2. SAME—HARTER ACT—APPORTIONMENT OF DAMAGES.

In cases falling within the Harter Act, the intent of the Act is that damages to cargo arising from negligence in navigation shall be borne by the cargo owner, and not by the ship; the Act was not designed to increase or to diminish the liability of the other vessel in cases of mutual fault and a division of damages. The previous liability of either vessel, therefore, cannot be exceeded, but may be reached, if that is necessary to indemnify the cargo of the other vessel; and where one vessel and cargo are wholly lost and the ship is of less value than the cargo, the shipowner can recover from the other vessel half his loss and retain it for his own use, and the cargo owner will lose so much of his claim. The lack of a sufficient mechanical horn and of means of repair on board when the ship sailed, is a defect in equipment which renders the Harter Act inapplicable. If sufficient means of repair were on board, the failure to repair would have been negligence in the management of the ship, making the Harter Act applicable. On this point leave to apply to give further evidence was allowed. This, however, does not here affect the extent of the Niagara's liability, but only the distribution of that amount as between the cargo owner and the owner of the Hales.

3. SAME—CAPTAIN'S AND SEAMEN'S PERSONAL EFFECTS.

The captain whose duty it was to attend to the sufficiency of the horn before sailing, can only recover half damages against the other vessel, which the latter can offset against her payment for cargo. The seamen, as the fault was in the equipment, can recover full damages; since it was the fault of the owners and not in the navigation or management of the ship to which they were privy.

Butler, Notman, Joline & Mynderse, for libellants.

Wing, Putnam & Burlingham, for the Niagara.

BROWN, District Judge. At about 7½ A. M. of Nov. 8th, 1895, the S. S. Niagara, bound from New York to Havana, came in collision during a dense fog off the coast of Virginia with the bark Hales, bound north from Havana. The wind was from the N. W. light and baffling, and the bark under nearly all sail was making very little headway on a course N. E. by N., bound from Havana to Philadelphia. The steamer was on a course of S. x W., ½ W., making from 9 to 10 knots. The bark was struck by the steamer's stem on the port bow forward of the knighthead, and sank in a few moments. Five of her crew were drowned, including the wheelman and the second mate, who was in charge of the watch on deck. The captain who was also on deck, the lookout, and one seaman, and the first officer, who was below, were saved. The steamer's foremast was carried away, but no other serious damage was sustained by her. On the bark no fog signal was heard from the steamer; on the steamer, none was heard from the bark until she was very near. The first notice of her presence was the sight of her top-gallant yards not far off and about right ahead, while her hull was not yet visible.

The libellant contends that the collision arose from too great speed of the steamer, and the lack of proper efforts on her part to avoid the bark. The respondents contend that it was because no fog signals were sounded on the bark till too late to avoid her.

The evidence leaves no doubt that the steamer's fog whistle was regularly and properly sounded. But it was 25 or 30 feet higher than the deck of the bark, and the failure to hear it on the bark may have been because the sound was reflected upwards by the denser medium of fog below the level of her whistle. The Lepanto, 21 Fed. 656, 657. And this explanation is rendered probable by the fact, testified to by the captain, that the rushing sound of the steamer's water was heard by him before she was visible, though he heard no fog whistle.

1. The speed of the steamer was from nine to ten knots, or nearly her full speed, and the fog was dense. Though the steamer was a little off from the straightest route, she was not in an unfrequented part of the ocean; and no precedents warrant holding nearly full speed of from 8 to 10 knots to be the "moderate speed" that the statute requires. I must, therefore, hold the steamer liable.

2. Upon the testimony of the several witnesses from the bark, I am not warranted in finding that no fog signals were given by

her. The failure to hear them on the steamer till the vessels were near, may be reasonably explained by the steamer's speed of nearly 1000 feet per minute, and the fact that the bark's signal was from a mouth horn instead of by a mechanical fog horn. This horn was heard probably just after the bark's top-gallant yards had been seen, from half a minute to a minute before the collision. As soon as the yards were seen, and before her horn was heard, signals were given to stop the engine, and hard-a-port, when the steamer was probably from 400 to 600 feet distant. At the steamer's speed of 9 to 10 knots, she would have been some 2000 feet distant, more or less, at the previous signal from the bark, if there was the ordinary interval of from one to two minutes between the signals; and at that distance the bark's horn quite naturally might not be heard. The testimony is explicit that the lookout took no part in the last trimming of the yards, though he did in previous trimming; and his own testimony that the mouth horn was blown is confirmed by many other witnesses.

No justifiable excuse, however, is shown by the bark for not giving the signals required by the 15th Rule of Navigation, viz., a signal by a mechanical fog horn. She had such a horn on board; but on the evening before the collision when the fog arose, the evidence indicates that the mechanical fog horn was found not to give a good sound, and the mouth horn was, therefore, used instead. There had been no previous fog on the voyage, and the horn had not been used or examined since the vessel sailed from Philadelphia. No explanation of its failure is given; and so little attention was given to it, that the attention of the master or first mate was not even called to its condition, and no attempt was made to remedy it.

As the mechanical horn was not fit for service the first time it was wanted on the voyage, and no explanation of this fact is given, it is impossible for me, upon the slight evidence submitted, to find that the bark was supplied with an "efficient" mechanical horn, such as the statute requires, when she sailed. Rule 12 requires that the vessel shall be provided with an "efficient fog horn, to be blown by mechanical means." Mouth horns are no longer required by law. In effect, they are condemned as insufficient at sea. At the recent Maritime Congress they were repeatedly said to be "useless." The intent of the statute is that mechanical signals shall be given instead of mouth signals. They are louder, and are not liable to the inequalities of mouth signals, given often by a fatigued lookout. To comply with the statute the ship must not only put a mechanical horn on board, but take all reasonable means to keep herself equipped with an efficient mechanical horn so as to be able at all times to give the mechanical signals required by statute.

It would seem, therefore, that the ship should be held bound to do whatever experience may show to be reasonably necessary for this purpose, whether by frequent inspection, and by providing means for the repair of the horn on board, as of other necessary equipment, if

she have but one horn; or by a spare mechanical horn from the start. Mechanical horns came into use under the English Act on September 1, 1880; under our Act, since March 3, 1885. The experience of 15 years has abundantly shown that a single horn is not to be wholly depended on. It is liable to fail upon the voyage, through undiscoverable defects, through age, through lack of necessary inspection, through the effects of weather, continuous use, or accident. Collision at sea in fog, on the other hand, is the greatest peril to life and property in modern navigation. If proper signals are not given, the whole freight and passenger traffic of the ocean are put in peril. Here 5 men lost their lives, and ship and cargo were sunk.

In the light of experience and the knowledge of the instability of mechanical horns, can it be said to be reasonable prudence, or a compliance with the statutory intent, that in the absence of frequent inspection, or means of repair on board, protection against the greatest of sea perils should stand on the chances of a single horn? Some vessels carry two mechanical horns; some carry one, with duplicate parts to repair what may become disordered; some carry mouth horns. All carry something additional. With the knowledge of this necessity, is it permissible for the ship to make no provision for. repair, and to provide only a mouth horn substitute which the Act of Congress has condemned, and which is often practically useless? See The Pennsylvania, 19 Wall. 125, 135–137; and see The Kenilworth, 64 Fed. 890, 892.

In the case of The Trave, 15 C. C. A. 485, 68 Fed. 390, it was suggested that the additional mouth horns are carried by vessels because "oftentimes in heavy weather the mechanical horn could not be used." As there was no evidence in the case on that point, I cannot help thinking that the Court in making this statement was in some way misled as to the fact. No such cases are reported. Scores of masters and seamen, examined on oath on this point, have stated to me that they have never known an instance in which the mechanical horn could not be used, when wanted, on account of rough weather. The box containing the mechanical horn is simple and easily portable. It is easily adjusted and fastened by its handles anywhere on deck, when fastening is desired, or it may be fastened by a screw; and in the few cases when fog and rough weather come together, it can be worked, if in good order, anywhere on deck, whenever a lookout can stand on the forecastle, or a helmsman at the wheel. In the reported cases, when the mouth horn was used, it was used, as in this case, not because the weather was bad, but because the mechanical horn was bad.

I have made these additional suggestions in order that whatever rule may be established on this subject, it may not rest on any misapprehension of fact.

In the case of The Chilian, 4 Asp. 473, the report does not indicate that any question was made as to a spare mechanical horn, the proper equipment of the vessel, or means of repair on board; and the case was decided with reference to the 17th section of the British Statute,

36 and 37 Vict. c. 85, which we do not have. The case arose also only a few months after the requirement of mechanical fog horns went into effect, and before experience had shown what equipment or means of repair are reasonably necessary for maintaining the ability of the vessel to give mechanical signals whenever required throughout the voyage.

The facts in the present case do, indeed, seem quite similar to those stated in the report of The Chilian; and the Court there found that the horn was "a right and proper instrument" on evidence which seems no better than in this case. There there was the same lack of inspection at intermediate ports; and the first time the horn was tried it would not work, and there was no explanation of its failure. In the case of The Trave, supra, the Court of Appeal found that the mechanical horn was originally an efficient horn, and that it gave out through unusually long continued use on the voyage. The Court did not have under consideration what findings ought to be made as to the sufficiency of the horn at the time the vessel sailed, when, as here, it was found inefficient the first time it was wanted on the voyage. To find the horn in this case to have been efficient when the vessel left Cuba; or that she performed her duty in inspecting it and in keeping and putting it in repair on the voyage, and providing means therefor, would involve such laxity in the application of the statutory rule as seriously to impair its value; other vessels would not have the protection the statute was designed to afford them, and responsibility for failure to give the required signals could not be enforced.

I must, therefore, find the sailing vessel in fault for not giving signals by a mechanical horn, as her failure to do so arose from her own neglect either to provide a good instrument or to keep it in proper repair. It is impossible for the bark to show that this omission is immaterial, or that the sound of a proper mechanical horn would not have been heard by the steamer in time to avoid the collision. In this regard the case is identical with that of The Pennsylvania, 19 Wall. 125, 136.

2. I have carefully considered the evidence and the arguments adduced by the libellants' counsel to show that the steamer had sufficient notice of the presence of the bark, by seeing her top-gallant yards, and by hearing at least one blast of the horn, to have avoided the collision, either by keeping on her course, or by reversing her engines instantly. The circumstances relied on seem to me, however, insufficient as against the evidence of the steamer's witnesses. The different estimates of time are most uncertain. The change of three points by the steamer, if it was so much, would be made in traveling 600 or 700 feet, and perhaps in less distance. The mate who was in charge testifies that he rang the bell to stop as soon as the top-gallant yard was seen, ordered hard-a-port, and almost immediately rang to reverse; and the engine was beginning to reverse when collision came. All the testimony indicates that the vessels were not over 700 feet apart, if so much, when the steamer became aware of the bark's presence, and not over half that distance when the steamer's

presence was known to the bark. It is possible that under a starboard helm, the steamer might have escaped, as the bark was moving slowly; but that depended upon the distance and speed of the bark; and if by such a manœuvre the steamer had not escaped, she would have received the bark's blow upon her side, and both might have perished. There is no reason to doubt the mate's competency, or that he exercised his best judgment in a sudden emergency. If erroneous, which I do not think can be clearly made out, it could not be held negligence or a legal fault.

Both vessels being, therefore, in fault, the owners of the bark are entitled to recover against the Niagara one-half their damages for the loss of the bark, to be applied so far as may be legally applicable and necessary in payment of the value of one-half of the cargo claimed under the other libel; and the Niagara is liable for any deficiency to make good the whole value of the cargo owners; as well as for one-half the claims for personal effects.

Decrees accordingly, with references to compute the damages, if not agreed upon.

(December 4, 1896.)

On settlement of the decree a further question is presented as respects the application of the Harter Act (2 Supp. Rev. St. p. 81, § 3); and if that act is applicable, how it affects the division of the damages.

If the insufficiency of the mechanical horn at the time when it was wanted, arose merely from the previous negligence of the master or mate to inspect it, and to repair it on board the ship, by means of suitable materials or duplicate parts for such repair supplied by the owners, the negligence would evidently be in the "management of the ship," and not from any lack of proper equipment for the voyage, so that the Harter Act in that case would apply. The Silvia, 64 Fed. 607, affirmed 15 C. C. A. 362, 68 Fed. 230. There is no evidence, however, that any such means of repair were supplied to the Hales; and I have found, therefore, that the vessel was defective in equipment, as respects the mechanical horn, at the time she left Cuba. It was no doubt the duty of the captain, and perhaps of the mate also, to inspect the horn, and see that it was in good order before leaving Cuba, or to get a new one. But the proper equipment at the commencement of the voyage is a duty of the owners; and any material omission in this regard, is chargeable against them, to whomsoever they may have delegated the duty of furnishing the proper equipment or supply. The Mary L. Peters, 68 Fed. 919; The Flamborough, 69 Fed. 470; The Rossmore [1895] 2 Q. B. 408. In my judgment, therefore, they are not here entitled to the benefit of the Harter Act upon the evidence as submitted. But as the subject of provision for repair on board was not raised on the hearing, and was not probably in the mind of either party, if further evidence on that point is desired to be submitted, application can be made on affidavits showing the nature of any such evidence.

If the Harter Act, however, were applicable, it would not affect the liability of the Niagara in the present case; but only the application,

as between the ship-owner and the owners of the cargo, of the sum the Niagara must pay. The Niagara suffered but little damage; while the loss of the Hales, and of the cargo, are estimated to have been respectively about $16,000 and $26,000. In applying the Harter Act to cases of division of damages for mutual fault, I have heretofore held (1) that it was not the intent of Congress to relieve the carrier vessel at the expense of the other vessel in fault, by increasing the latter's liability, but that the intent was that the cargo should bear the consequences of the carrier's neglect in navigation; (2) that the relief given by the Act to the carrier vessel from responsibility for damage to her cargo, could not be nullified indirectly by a charge against her in the shape of an offset in favor of the other vessel in fault on account of that same cargo; (3) that the extent of the latter vessel's previous liability on the particular facts of each case was not to be diminished by the Harter Act from what she would previously have been bound to pay, except as respects her own cargo; and (4) that the result, therefore, must be that the cargo owner of each ship must stand charged under the Harter Act with so much of the cargo damage as the carrier ship is relieved from by that Act, whenever and so far as that is necessary to avoid any increase in the previous liability of the other ship. The Viola, 60 Fed. 296.

Upon any complication, the first inquiry is, to what amount was each vessel, or her owner, liable under the previous law, upon the particular facts of the case? Under the Harter Act, if it is applicable, that liability cannot be exceeded, and it will remain the same, if necessary to make good the damage to the cargo of the other ship. In getting at the amount which either vessel is to pay under the Harter Act, her own cargo is to be treated as non-existent; because where the Harter Act is operative the carrier vessel (A) is not liable for that item of damage. But the other ship (B) is bound to pay that item of cargo loss, as well as one half the damage to the two ships, up to the limit previously ascertained, as above stated, if the remaining value of the ship (B) and her pending freight are sufficient for that purpose. Where this value is not sufficient, and the damage to the first vessel (A) is greater than the damage to the other ship (B), two conflicting claims arise, one in favor of the ship A, for the purpose of equalizing the loss on the two vessels, and another claim for the loss on A's cargo. As those claims arise at the same time, and are of equal merit, the remaining value of the ship B and her pending freight should be apportioned pro rata, according to the amount of the two claims.

In the present case the Hales' loss was about $16,000; that of her cargo about $26,000. The loss on the Niagara was slight, and of her cargo, nothing. Before the Harter Act, the Niagara, upon the above figures, would have been obliged to pay $8,000 for half the loss of the Hales (which would, however, have been applied upon the latter's liability to her cargo); $13,000 for half the cargo loss, and $5,000 in addition, on account of the total loss of the Hales, in order fully to indemnify the cargo, making $26,000 in all. The Atlas, 93 U. S. 302. Under the Harter Act, the Hales being relieved from any liability to

her cargo for this damage, her owners would retain the $8,000 for their own use, instead of applying it on the cargo as before; but the Niagara's liability is not to be thereby increased or diminished. This item of loss is transferred by the Harter Act to the cargo. The Niagara must pay, therefore, as before, $13,000, and the $5,000 (that is, $18,000), on account of the cargo loss, and the cargo-owner loses the $8,000, which his carrier under the Harter Act is entitled to retain. It is immaterial, therefore, to the Niagara whether the Harter Act is applicable or not. It affects only the distribution of the $26,000.

As respects the personal effects of the master, officers and crew aboard the Hales, the rule followed in this Court has been that the ship's company are identified in interest with their own ship as respects any damages arising from faults in navigation, which is their common duty and employment, and that they, therefore, recover half damages from the other ship in cases of mutual fault. The Queen, 40 Fed. 694; Killien v. Hyde, 63 Fed. 172, 176; The A. Heaton, 43 Fed. 592; Quebec S. S. Co. v. Merchant, 133 U. S. 378, 10 Sup. Ct. 397; Hedley v. Steamship Co. [1892] 1 Q. B. 58.

In the present case the lack of a proper mechanical horn at the beginning of the voyage was not any fault of navigation, but a defect in the performance of the owner's duties, for which the owners would be responsible to their own servants. See cases above cited. The seamen are, therefore, here entitled to recover for loss of their effects against the Niagara precisely as damage for the loss of cargo could be recovered. It was undoubtedly the master's duty to see that the horn was in good condition before he sailed from Cuba. As against the Niagara, he could recover half damages for loss of personal effects; but, as he is also liable to the cargo for half damages, the Niagara is entitled to offset this against her payment to cargo, as before the Harter Act.

Unless the parties can agree on these points, further evidence in relation thereto will have to be taken.