## THE NIAGARA.

### STAHL et al. v. THE NIAGARA.

### JOHNSON et al. v. SAME.

#### (Circuit Court of Appeals, Second Circuit.   January 25, 1898.)

#### Nos. 18 and 19.

1. COLLISION—STEAMER—EXCESSIVE SPEED IN FOG.
   From 9 to 10 knots an hour in a dense fog is excessive speed for a steamer not in an unfrequented part of the ocean.

2. SAME—DEFECTIVE EQUIPMENT—MECHANICAL FOG HORN.
   Failure of a sailing vessel, which tested a mechanical fog horn before sailing for Cuba, to test the same, after a long stay at Havana, before starting on the return voyage, or at any time until shortly before collision, when it was found to be out of condition, so that a mouth horn had to be used, *held* to show such a defect in the equipment of the vessel as to place her in fault for collision with a steamer which failed to hear the mouth horn.

3. SAME—HARTER ACT.
   Failure to have a mechanical fog horn in good condition for use at the commencement of a voyage shows want of due diligence in equipping the vessel, and is not a fault in her management, so as to excuse the owners from liability under the Harter act.
   77 Fed. 329, affirmed.

Appeal from the District Court of the United States for the Southern District of New York.

On the morning of November 8, 1895, the bark Hales, owned by John B. Stahl and others, collided with the steamer Niagara, owned by the New York & Cuba Mail Steamship Company, and was entirely lost, with her cargo. The owners of the bark libeled the steamer to recover damages to the bark and her freight. The captain and crew joined in this libel to recover the value of their personal effects, which were also entirely lost. Lawrence Johnson and others, the owners of the cargo on board the bark, filed another libel against the steamer to recover the value of the cargo. The Niagara was very slightly injured. The alleged faults of the steamer were in proceeding at an immoderate rate of speed in a fog, in not giving signals with her steam whistle, in not maintaining a sufficient lookout, in not coming to a stop before the collision, and in not avoiding the bark. The faults of the bark which were alleged in the answer were in not sounding fog signals, in not attending to the whistles of the Niagara, in having no lookout in attendance upon his duties, in not being sufficiently manned, and in failing to have and use an efficient mechanical fog horn. The district court found that each vessel was in fault, and upon the libel of the owners of the cargo a decree was given in their favor for $27,140.57, its full value, and in the action brought by the owners and crew of the bark a decree was entered in favor of the officers and crew, except the master, for the value of their effects, which amounted to $425.28. The losses of the owners and master of the bark were extinguished by the set-off which the Niagara was entitled to in respect to the cargo, because half the value of the cargo exceeded the one-half value of the bark,—her whole value being about $16,000, —her freight moneys, and the effects of her owners lost therewith. The crew were not found to have been privy to the bark's fault. The owners of the bark appealed from the decree holding her at fault, and the claimant of the steamer appealed from both decrees. If the facts found by the district court should be found by the appellate court to be true, no criticism was made upon the provisions of the decrees in regard to the distribution of the damages.

Wilhelmus Mynderse, for appellants Stahl and others.

Harrington Putnam, for appellant New York & Cuba Mail S. S. Co.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge (after stating the facts). The district judge found the following facts, in the accuracy of which we concur: At about 7:30 a. m. of November 8, 1895, the steamship Niagara, bound from New York to Havana, came in collision, during a dense fog, off the coast of Virginia, with the bark Hales, bound north from Havana. The wind was from the northwest, light and baffling, and the bark, under nearly all sail, was making very little headway on a course northeast by north, bound from Havana to Philadelphia. The steamer was on a course of south by west one-half west, making from 9 to 10 knots. The bark was struck by the steamer's stem on the port bow forward of the knighthead, and sank in a few minutes. Five of her crew were drowned, including the wheelman and the second mate, who was in charge of the watch on deck. The captain, who was also on deck, the lookout, and one seaman and the first officer, who were below, were saved. The steamer's foremast was carried away, but no other serious damage was sustained by her. On the bark no fog signal was heard from the steamer; on the steamer none was heard from the bark until she was very near. The first notice of her presence was the sight of her top-gallant yards not far off, and about right ahead, while her hull was not yet visible. The evidence leaves no doubt that the steamer's fog whistle was regularly and properly sounded. But it was 25 or 30 feet higher than the deck of the bark, and the failure to hear it on the bark may have been because the sound was reflected upwards by the denser medium of fog below the level of her whistles (The Lepanto, 21 Fed. 656, 657); and this explanation is rendered probable by the fact, testified to by the captain, that the rushing sound of the steamer's water was heard by him before she was visible, though he heard no fog whistle.

1. The speed of the steamer was from 9 to 10 knots, or nearly her full speed, and the fog was dense. Though the steamer was a little off the straightest route, she was not in an unfrequented part of the ocean, and no precedents warrant holding nearly full speed of from 8 to 10 knots to be the "moderate speed" that the statute requires. I must, therefore, hold the steamer liable.

2. Upon the testimony of the several witnesses from the bark, I am not warranted in finding that no fog signals were given by her. The failure to hear them on the steamer till the vessels were near may be reasonably explained by the steamer's speed of nearly 1,000 feet per minute, and the fact that the bark's signal was from a mouth horn instead of by a mechanical fog horn. This horn was heard probably just after the bark's top-gallant yards had been seen, from half a minute to a minute before the collision. As soon as the yards were seen, and before her horn was heard, signals were given to stop the engine, and hard a-port, when the steamer was probably from 400 to 600 feet distant. At the steamer's speed of 9 to 10 knots, she would have been some 2,000 feet distant, more or less, at the previous signal from the bark, if there was the ordinary interval of from one to two minutes between the signals; and at that distance the bark's horn quite nat-

urally might not be heard. The testimony is explicit that the lookout took no part in the last trimming of the yards, though he did in previous trimming; and his own testimony that the mouth horn was blown is confirmed by many other witnesses.

3. I have carefully considered the evidence and the arguments adduced by the libelant's counsel to show that the steamer had sufficient notice of the presence of the bark, by seeing her top-gallant yards, and by hearing at least one blast of the horn, to have avoided the collision, either by keeping on her course, or by reversing her engines instantly. The circumstances relied on seem to me, however, insufficient as against the evidence of the steamer's witnesses. The different estimates of time are most uncertain. The change of three points by the steamer, if it was so much, would be made in traveling 600 or 700 feet, and perhaps in less distance. The mate who was in charge testifies that he rang the bell to stop as soon as the top-gallant yard was seen, ordered hard a-port, and almost immediately rang to reverse; and the engine was beginning to reverse when collision came. All the testimony indicates that the vessels were not over 700 feet apart, if so much, when the steamer became aware of the bark's presence, and not over half that distance when the steamer's presence was known to the bark.

These findings of fact, which cannot be successfully attacked, ascribe to each vessel a violation of an important statutory rule, without adequate excuse, which produced a consequent liability. The Pennsylvania, 19 Wall. 125. If a violation was excusable, the burden was upon the offending vessel to present a sufficient justification. The claimant of the Niagara undertakes to excuse her rapid speed by the suggestion that she was out of the customary track of sailing vessels, and especially out of the way of coasting vessels. This suggestion, whatever might be its value if it was adequately supported by the facts, is sufficiently answered by the court finding that "she was not in an unfrequented part of the ocean," a fact which is evident in the history of the voyage on the night of November 7th.

The libelants signally fail in furnishing any excuse for the bark's failure to have an efficient mechanical fog horn. She left Philadelphia for Havana on August 22, 1895, with an efficient Norwegian mechanical horn on board, which had been casually tried in Philadelphia by the first mate and one of the owners, who had previously also been the captain of the vessel. The occasion for this examination was a conversation as to the respective merits of the horns made under the Norwegian and United States patents, when the horn was taken and tried by one of the participants in the conversation. The vessel reached Havana in September, remained there 43 days, sailed for Philadelphia on October 27th, and there is no evidence that the horn was tried until the night of November 7th, when it was found unfit for use. Under these circumstances it cannot be found that the vessel had, when she left Havana, the efficient mechanism which it was the duty of the owners to furnish as a necessary part of her equipment. The district judge furthermore properly held that any material omission in the proper equipment at the commencement of the voyage is chargeable

against the owners, "to whomsoever they may have delegated the duty of furnishing the proper equipment or supply." No provision in the "Harter Act" of February 13, 1893 (27 Stat. 445) diminishes the obligation of the owners of a vessel which transports property from or between ports of this country and foreign ports to exercise due diligence to properly equip and outfit their vessel. The primary duty rests upon them, and any omission by the captain to discharge it cannot be called an error in the management of the vessel. The libelants cite The Trave, 35 U. S. App. 321, 15 C. C. A. 485, and 68 Fed. 390, as an authority that the nonefficiency of the horn which had been theretofore provided was sufficiently excused. The facts in the two cases radically differ from each other. In The Trave, an efficient mechanical horn had been provided by the Edwin B. Taylor, one of the colliding vessels, at the commencement of the voyage, and had been in necessary and continued use during the voyage, until by such use, and not from want of proper attention and care on the part of the navigators, its efficiency had become seriously impaired. The decision as to the liability of the Taylor was founded upon that state of facts. In this case there is no evidence that at the commencement of the voyage from Havana the vessel had an efficient instrument, except that a casual examination before she left Philadelphia indicated its efficiency at that time. The value of universal and thorough compliance with the statutory requirement, and the importance of the requirement itself, forbid that such slender testimony should be regarded as sufficient to satisfy the demands of the rule.

The claimant makes the point that the crew of the bark were themselves privy to some of the alleged errors in her navigation, and therefore that the decree in their favor for the value of their effects should not have been entered, but that the Niagara should have had the benefit of the set-off which she had against the owners of the bark, but the crew were not privy to the only fault which can properly be found against the Hales. The decrees of the district court are affirmed, without costs in this court.