Estelita Lamartiniere **TONEY**, Individually and in her capacity as Personal Representative of the Decedent, Dewayne Toney, and in her capacity as the Natural Tutrix of Ruben Duane Toney and Sheranda Faye Toney,

v.

**UNITED STATES ARMY CORPS OF ENGINEERS and the United States of America.**

**Civ. A. No. 74–24.**

United States District Court,
M. D. Louisiana.
July 14, 1975.

Charles R. Moore, Baton Rouge, La., for plaintiff.

Douglas M. Gonzales, U. S. Atty., Robert S. Leake, Asst. U. S. Atty., M. D. La., Baton Rouge, La., Clayton G. Ram-

sey, Admiralty & Shipping Section, U. S. Dept. of Justice, Washington, D. C., for United States Army Corps of Engineers and the United States.

E. GORDON WEST, District Judge:

This suit, an action under general maritime law for wrongful death, was brought as a result of a collision between a small "bateau" boat in which the decedent Dewayne Toney was riding and an anchor barge owned by the United States Army Corps of Engineers, which occurred on the Mississippi River on January 15, 1974. Jurisdiction was founded upon the Constitution and laws of the United States, particularly the Suits in Admiralty Act, 46 U.S.C. § 741 et seq., and the Public Vessels Act, 46 U.S.C. § 781 et seq. Plaintiffs are the surviving wife and two minor children of Dewayne Toney, who drowned following the collision.

Trial was held, without the intervention of a jury, on March 14, 1975. At the conclusion of the trial, counsel for both parties were ordered to file post-trial briefs, after the receipt of which the matter was submitted on the record as it then stood. Now, after due consideration of the entire record in this case, including the pleadings, briefs and arguments of counsel, testimony, depositions, exhibits and other evidence presented at trial, this Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. On January 4, 1974, Mr. Charles M. Keistler, Master of the M/V MISSISSIPPI, Memphis District Corps of Engineers, received orders from Mr. James W. Harrison, Chief Revetment Branch, Vicksburg District Corps of Engineers, to proceed "light boat" to Delta Point and there to pick up a number of loaded Memphis mat barges and one anchor barge for delivery at St. Francisville. The orders instructed Keistler to "Anchor fleet above Bayou Sarah on left descending side of river."

2. On January 6, 1974, the M/V MISSISSIPPI anchored a fleet of barges in the Mississippi River near St. Francisville, Louisiana, at about mile 267 AHP. Both the M/V MISSISSIPPI and the fleet of barges were owned and operated at all pertinent times by the Department of Army, Corps of Engineers.

3. One of the barges in the fleet was an anchor barge, the AB–2870. This barge is 120 feet long, 30 feet wide and 7 feet deep. It carries two 6,000 pound anchors which enable it to serve as a mooring anchorage for loaded or unloaded articulated concrete mattress barges used in revetment construction. Normal procedure for anchoring is to place the anchors upriver of the barge, and then let the barge drift downstream to tighten the two anchor cables.

4. On January 6, 1974, the AB–2870 and the barges moored to it were anchored 300 to 400 yards off the north, or left descending, bank of the river in the vicinity of mile 267 AHP. This position is outside of the navigable channel at that point in the river, according to navigation maps of the area prepared by the Corps of Engineers, and was not at the time of the accident a "special anchorage area" as designated by the Secretary of the Army. The barges remained in that location until after the accident in question. None of the barges had on board a sound producing device of any kind.

5. On January 15, 1974, Dewayne and Jessie Toney met five other persons at the St. Francisville Ferry Landing between 5:30 and 6:00 a. m. for the purpose of going duck hunting in several bean fields located up-river from the ferry landing which had been flooded by the high, rising waters of the Mississippi River.

6. The party of seven occupied three boats, which they launched at a public launching facility located next to the ferry landing. An unusually dense fog covered the river that morning which, together with the darkness, made navi-

gation difficult. After leaving the ferry landing the boats proceeded single file up river, shining lights onto the flooded tree line to find their way.

7. Dewayne and Jessie Toney occupied the second boat in the procession, a 14 foot "bateau," powered by a twenty h. p. outboard motor. The Toney brothers were following the lead boat at "idling speed," keeping sight of its running lights and the spotlight it was shining on the tree line.

8. The Toney brothers intended to hunt in the first bean field, which is located approximately a mile upriver from the ferry landing. When the boats arrived at that point the Toney boat turned toward the bean field, while the remaining members of the party headed upriver to the second bean field, where they remained until contacted later in the day.

9. The Toneys had either motored a short distance into the bean field or had not entered the field at all, when they became lost in the fog and unknowingly made their way away from the bank and into the river. Jessie Toney, who was operating the boat, shut down the motor to listen for fog signals and to wait for daylight so that he could determine their position.

10. The motor had been shut off for a matter of seconds when Jessie Toney heard water lapping which sounded to him like "A boat on top of us" or as if they had somehow drifted in front of a tow. Toney started the motor and motored away from the sound.

11. As the Toney brothers motored away, they caught sight of the moored fleet of barges. They drifted down river safely past the barges along the south, or mid-river, side of the fleet. Once safely past the barges, however, they decided to come back alongside and look "for a rope or something to hold onto, just to get our bearings." They then motored back up river along the north, or river bank, side of the barges to a point upriver from and in front of the barges.

12. The Toneys sighted the cables of the anchor barge and were considering tying up to one of them, when Jessie Toney realized that the boat was in a dangerous position because of the strong current. He tried to motor away, but the current carried the boat into the anchor cable. The resulting impact caused the boat to take on water and begin to capsize.

13. Both men grabbed the anchor cable and began climbing up to the deck of the AB–2870. Jessie Toney was able to swing himself over the side and onto the deck of the barge. Dewayne, however, lost his grip, fell into the river and drowned. Although Jessie Toney expressed some confusion over the question at the taking of his deposition and at trial, the evidence adduced convinces this Court that neither of the men was wearing a life preserver at the time of the accident.

14. Jessie Toney was rescued from the barge somewhat later in the day. His brother's body was never found. At the time of his death, Dewayne Toney was 23 years old, married, and had two children.

It should be noted that the only eye witness to this accident, Jessie Toney, gave two versions of this tragic incident at various stages of the litigation. In a statement to a West Feliciana Parish Sheriff's Deputy on the day of the accident, and later at a coroner's inquest and to an investigator for the plaintiff's counsel, Toney stated essentially that neither he nor his brother saw a barge or a cable until it was too late to motor away from them. At the taking of his deposition, however, Toney related the story substantially as contained in the above findings of fact.

Apparently because of these conflicting versions, at the trial of this case neither plaintiff nor defendant wished to call Mr. Toney as a witness and vouch for his credibility. The Court was thus obliged to call Mr. Toney as a court witness, and to give each side an opportunity to cross examine him, in order to

try to ascertain from him the one truthful, accurate version of the accident.

Toney was informed by the Court before he testified of the penalties for perjury, and he swore to tell the truth. Under oath he stated that the earlier versions he had given of the accident were untrue, and that he changed his story *before* his deposition was taken. Toney informed the Court that the reason for this change in story was a religious one—that he had in previous versions been "bearing false witness," and that his trial testimony, which corresponded with his earlier deposition testimony, correctly and accurately related the manner in which the accident really occurred.

This Court is convinced, after reviewing all of the statements and testimony given by Jessie Toney, that the version of the accident given by him at the trial and at his deposition is the correct and accurate version of the accident. It is for this reason that the Court has approved and adopted a summary of that version in its findings of fact.

## CONCLUSIONS OF LAW

■ 1. This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1333, and under the general maritime law. *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 90 S.Ct. 1772, 26 L. Ed.2d 339, 1970 A.M.C. 967 (1970); *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9, 1973 A.M.C. 2572 (1974), rehearing denied 415 U.S. 986, 94 S.Ct. 1582, 39 L. Ed.2d 883 (1974). Venue is properly laid in the Middle District of Louisiana.

2. Rule 13, Rules of the Road, Western Rivers (33 U.S.C. § 322), requires vessels at anchor to display anchor lights. The evidence contained in the record of this case and adduced at trial by plaintiffs is too inconclusive to establish a violation of this statute by defendants, but as will hereinafter be shown, whether or not this statute was, in fact, violated, is immaterial.

3. Rule 15(d), Rules of the Road, Western Rivers (33 U.S.C. § 331), requires vessels at anchor in fog to have aboard, and to periodically ring, a fog bell. The AB–2870 did not have a fog bell on board on January 15, 1974, and this omission constituted a violation of that statute.

■ 4. Where a vessel has been found to be in violation of a statute at the time of a collision, the vessel thus cast in fault must prove, to escape liability, not only that the fault shown probably did not but also that it *could not* have contributed to causing the collision. *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874); Gilmore and Black, The Law of Admiralty, § 7–5, n. 49 (2d Ed. 1975). The vessel seeking to escape liability need not, however, show that its fault could not "by any stretch of the imagination" have contributed causally to the disaster; it is sufficient if the proofs adduced show that the violation could not have, or in fact did not, contribute causally to the collision. *China Union Lines v. A. O. Andersen & Co.*, 364 F.2d 769, 1966 A.M.C. 1653 (CA 5 1966), cert. den. 386 U.S. 933, 87 S.Ct. 955, 17 L.Ed.2d 805 (1967).

■ 5. The defendants have successfully carried their burden of proof by a preponderance of the evidence. The purpose of the statute violated by defendants is to alert other vessels to the presence of a vessel anchored in fog. However, the Toneys' visual sighting of the anchor fleet, their drifting safely past the fleet while still in sight of it, and their intentional positioning of themselves up river from and in front of the AB 2870 in search of a place to tie up to, supplants and exceeds any awareness they could, or would have gained of the barges' whereabouts by hearing a fog bell. It was this intentional and voluntary act of Jessie and Dewayne Toney, and not the statutory violation by the defendants, that caused the collision. They saw the barges, and drifted past them; if they had not deliberately cho-

sen to go back up river in front of the barges, the collision would not have occurred.

■ 6. The evidence has also failed to establish negligence by any general standards on the part of defendants in anchoring the barge fleet in the area where it was moored. The barges were moored outside of the navigable channel, and indeed were also outside of the channel which ordinarily was used by duck hunters. Testimony further established that vessels often navigated outside of the navigable channel during times of high water, but that they did so *at their own risk*. Had the Toneys stayed close to the tree line or in the bean field, as they had intended, they would have been safe. It is only because they lost their bearings in the fog and drifted into the river that they initially found themselves in a position of peril. Having thus placed themselves in peril, they were still able to extricate themselves by motoring away from and past the barges, which they safely did. Thus, even if the barges had been anchored in an unsafe position, that position played no causal part in the collision. See Gilmore and Black, The Law of Admiralty, § 7–5 at n. 54a (2d Ed. 1975). It was the act of Dewayne and Jessie Toney in deliberately and voluntarily repositioning themselves in front of the barges, after having first drifted safely past them, that led ultimately to the collision.

■ 7. This Court is aware of the recent U. S. Supreme Court decision in *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L. Ed.2d 251 (1975), in which the former admiralty rule of divided damages whenever two or more parties involved are found to be guilty of contributory fault in a collision or stranding case was replaced by a comparative fault concept. The application of both of these rules, however, is contingent upon a finding that both of the parties were guilty of negligence contributing to the accident. As the Court has concluded that the de-

fendants in this case committed no acts of negligence which in any way contributed causally to the collision, the rule of comparative fault has no application to this case.

As plaintiffs have failed to carry their burden of proof by showing that the defendants, United States Army Corps of Engineers and the United States of America, were guilty of a statutory violation or any acts of negligence which contributed causally to the collision, judgment will be entered herein in favor of the defendants, United States Army Corps of Engineers and the United States of America, dismissing plaintiff's suit, each party to bear its own costs.