Silvario GASPAR and Pearl D. Gaspar, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 76–3311–C.

United States District Court, D. Massachusetts.

Nov. 20, 1978.

Solomon Sandler, Gloucester, Mass., for plaintiffs.

Carolyn Grace, Asst. U. S. Atty., Boston, Mass., John T. Shepherd, Trial Atty., Admiralty & Shipping Section, U. S. Dept. of Justice, Washington, D. C., for defendant.

## OPINION

CAFFREY, Chief Judge.

This is an action by the plaintiffs, Silvario Gaspar and Pearl D. Gaspar, to recover damages sustained when their fishing vessel BLUE WATERS sunk after it collided in the Gloucester Inner Harbor with an unmanned barge, the MARGARET T. The complaint alleges that the damages were due solely to the negligence of employees of the United States Coast Guard. This action is properly maintainable under the Suits in Admiralty Act, 46 U.S.C.A. § 742, as amended in 1960. The Act subjects the United States to liability in personam in cases in which a proceeding in admiralty could be maintained if a private person were involved. *Lane v. United States*, 529 F.2d 175 (4th Cir. 1975). *See also, Roberts v. United States*, 498 F.2d 520 (9th Cir.), *cert. denied*, 419 U.S. 1070, 95 S.Ct. 656, 42 L.Ed.2d 665 (1974); *DeBardeleben Marine Corp. v. United States*, 451 F.2d 140 (5th Cir. 1971); *Richmond Marine Panama, S.A. v. United States*, 350 F.Supp. 1210, 1219–20 (S.D.N.Y.1972); *Tankrederiet Gefion A/S v. United States*, 241 F.Supp. 83 (E.D.Mich. 1964). *Contra, J. W. Petersen Coal & Oil Co. v. United States*, 323 F.Supp. 1198 (N.D. Ill.1970). After bench trial, I find and rule as follows:

The BLUE WATERS is a wooden-hulled fishing vessel built in 1941. She is 89.2 feet in length, 21.3 feet in beam and draws 9.0 feet. On April 29, 1976, the captain of the BLUE WATERS, Silvario Gaspar, was in command of the vessel which had returned from a fishing voyage with a catch of about 55,000 pounds of fish. The BLUE WATERS tied up briefly at the Ice House on the Gloucester Marine Railways Wharf, located in the Gloucester Inner Harbor. It was the intention of Captain Gaspar to proceed early the next morning to Boston in order to sell the catch at a fish auction

scheduled to begin shortly after 5:00 A.M. that morning.

The Gloucester Inner Harbor runs from northeast to southwest terminating in the Gloucester Harbor. The west side of the channel runs south from the Gloucester Marine Railways Wharf and bends southwest at Buoy 15. The collision occurred in a fairway lying adjacent to the west side of the Inner Harbor Entrance Channel and to the southwest of Buoy 15. The National Ocean Survey Chart No. 13281, formerly Geodetic Survey Chart No. 283 for Gloucester Harbor, is used here for purposes of placing pertinent locations.

At approximately 1:30 A.M. on April 30, the BLUE WATERS backed out of the Gloucester Marine Railways Wharf and proceeded towards the Entrance Channel and the open sea. This course brought the BLUE WATERS to the starboard of Buoy 15. Testimony has established that on numerous prior occasions the BLUE WATERS exited the Harbor in this manner, taking Buoy 15 to its starboard, without incident. Further testimony has established that it was the custom and practice of fishing vessels leaving the Gloucester Marine Railway Wharf to take Buoy 15 to its starboard.

As the BLUE WATERS proceeded toward the mouth of Gloucester Harbor and the open sea, Captain Gaspar was in the pilot house at the wheel, his brother Carlos, whose fishing experience includes four years as a captain, was standing watch on the portside immediately aft of the whaleback, and Manuel Rocha, whose fishing experience includes fifteen years as a captain, was standing watch on the starboard side between the end of the whaleback and the forward starboard gallows frame.

Unknown to Captain Gaspar and the other members of the crew of the BLUE WATERS, the barge MARGARET T, which had a length of 124.9 feet, had been causing problems in Gloucester Inner Harbor for several days. This barge had recently been sold by the Lipman Marine interests to one Stephen Draper. On or about August 29, 1976 persons unknown moved the MARGARET T from the Lipman dock to the State

Fish Pier located in the North Channel of the Gloucester Inner Harbor. For reasons which were not established on the record, it had been caught adrift in the inner harbor at least twice on August 29, and, as a result, it had been characterized in Coast Guard messages as a menace to navigation. Each time the MARGARET T was found adrift, the Coast Guard secured her to the State Fish Pier.

Sometime between midnight and about 1:00 A.M., the Coast Guard was again notified that the MARGARET T was adrift and the officer of the day, Thomas Dutton, contacted Chief Warrant Officer (CWO) Edmund Paradis, the commanding officer at the Gloucester Coast Guard Base, for instructions as to what course of action should be taken with reference to securing the MARGARET T for the purpose of eliminating the risk to navigation it presented. CWO Paradis testified, and I find, that he decided not to tie the MARGARET T to the State Fish Pier and that he also decided not to tie her to either of the two piers which were unoccupied at the Coast Guard Base. I find that, although those piers were available for securing the MARGARET T, CWO Paradis elected instead to attach it to anchorage Buoy A. That buoy was immediately adjacent to the fairway where the collision occurred and 240 feet northwesterly of channel Buoy 15.

It was stipulated that the MARGARET T was secured to anchorage Buoy A with a 20-foot-long line that when added to the 129.5 feet length of the MARGARET T, and combined with the wind direction blowing west, northwest at fifteen knots, made it possible for the stern of the barge to extend out from the anchorage area into the fairway.

I find that prior to April 29 the MARGARET T had been partially dismantled, that its pilot house and all structures above her deck had been removed, and that virtually nothing was visible but its long, low-lying black hulk.

I further find that when Captain Gaspar was less than 25 yards from Buoy A and about 15 yards from the barge, he spotted

the barge and then a single light that appeared to be on the water's surface. At that moment, the lookouts also spotted the barge MARGARET T obstructing passage over the fairway. The BLUE WATERS almost instanuly struck the stern of the MARGARET T.

Several witnesses called by the government testified that at the time the MARGARET T was anchored to Buoy A, Coast Guardsmen placed aboard her fore and aft two flashing white, stroboscopic, battery-operated lights of a type which are normally used with flotation rings to help rescue crews locating persons floating at sea.

There is sharp conflict in the testimony as to whether or not these strobe lights, which I find were in fact placed aboard the MARGARET T, were placed in such a manner as to be visible at any appreciable distance therefrom. Captain Gaspar testified that from the pilot house he was able to see only one of the stroboscopic lights but not until he was a mere 15 yards away from the MARGARET T. He testified that the stern light then appeared to him as if it were a small blinking flashlight at the waters level. His brother Carlos and Manuel Rocha, the two men on watch, both testified that at no time prior to the collision did they see either strobe light. An examination of the photographic evidence entered in this case, coupled with the testimony of the crew members of the BLUE WATERS, which I believe, persuades me that the stroboscopic lights were placed on the barge in such a manner as not to be visible except at very close range, and, in any event, they were not visible far enough away to permit a boat being operated at a proper speed to see them in time to avoid a collision.

Plaintiffs claim that the Coast Guard was negligent because the barge MARGARET T was (1) improperly anchored and (2) improperly lighted.

■ The Coast Guard, once having decided to anchor the drifting, unmanned barge MARGARET T, was responsible for taking the proper precautions demanded by maritime law. *Compare United States v. Sandra & Dennis Fishing Corp.*, 372 F.2d 189,

197 (1st Cir.), *cert. denied*, 389 U.S. 836, 88 S.Ct. 48, 19 L.Ed.2d 98 (1967). Before the Coast Guard can get the benefit of presumptions reserved for anchored vessels, it must be shown that the barge was anchored and lighted in accordance with statutory rules intended to prevent collision. *Skidmore v. Grueninger*, 506 F.2d 716 (5th Cir. 1976); *Rogers v. Saeger*, 247 F.2d 758 (10th Cir. 1957); *Willis v. Tugs Tramp and Mars*, 216 F.Supp. 901 (E.D.Va.1962); *Walter G. Hougland, Inc. v. The M/V Carport*, 194 F.Supp. 723 (E.D.La.1961). Not only has the Coast Guard failed to sustain this burden, but the evidence shows that the MARGARET T, because of her inadequate lights and her place of anchorage, was a menace to navigation in Gloucester Inner Harbor.

■ 33 U.S.C.A. § 409 prohibits anchorage in a navigable channel in such a way as to obstruct navigation. Although a penal statute, it establishes a standard of care applicable in a negligence action for damages. *Atlantic Refining Co. v. Moller*, 320 U.S. 462, 464 n. 1, 64 S.Ct. 225, 88 L.Ed. 168 (1943). The plain purpose of this statute is to maintain and promote the safety of navigation. *Id.*

In the instant matter, I rule that the Coast Guard was negligent in failing to take all available precautions to check the barge's position at the time of anchoring. Anchoring a vessel so that it extended into the fairway, a navigable channel, when there were available Coast Guard docks but a few hundred yards away, was an obstruction to navigation that I find was unnecessary and rule a negligent act which caused the collision. *See e. g., The Southern Cross*, 93 F.2d 297, 299 (1937). Certainly ordinary prudence required the Coast Guard to anchor the MARGARET T so that she did not extend into the fairway where the Coast Guard knew or should have known the fishing fleet would be passing over in the early morning.

Having anchored it in violation of the applicable statute, the burden was on the Coast Guard to justify the position of the MARGARET T. *The Southern Cross, su-*

*pra.* CWO Paradis testified that the reason he decided not to secure this barge to the Coast Guard piers was his apprehension that if he did so "he would own it." It was his opinion that if he instructed his subordinates to secure this hulk to Buoy A he would be able to order the owners to remove it after daybreak. But he was worried that, if he tied it up alongside the Coast Guard pier out of the way of harbor traffic, he would have trouble in causing the owners to remove it. Having in mind the function and duty of the Coast Guard, I find this response inadequate and rule that the government did not meet its burden to justify its choice of anchorage.

In addition, Article 11 of the Inland Rules, 33 U.S.C.A. § 180(a), provides that an anchored vessel such as the MARGARET T "shall carry forward, where it can best be seen, a white light in a lantern so constructed as to show a clear, uniform, and unbroken light visible all around the horizon at a distance of at least two miles." Here, there is no question of statutory violation; it was stipulated that the blinking strobe lights placed on the barge did not comply with the requirements of 33 U.S.C.A. § 180. It is unquestionable that the purpose of the statute violated by the defendant is to alert other vessels to the presence of a vessel anchored at night.

The government argues that the omission of proper lights should be disregarded because the stroboscopic lights afforded adequate warning of the barge's presence. At trial, in answer to the Court's question as to why lights designed for another purpose were installed on the barge, the CWO of the Gloucester Coast Guard base responded that they were the only lights available. Having in mind the purpose of the statute, the function of a Coast Guard station and the resources of the United States Government, this is an unsatisfactory, inadequate and pathetic answer to one of the important questions in this case. Other courts have excused omission of proper lights only when they have found that the display of proper lights could not have prevented the collision. *See, e. g., Socony Vacuum Oil Co., Inc. v. Smith,* 179 F.2d 672 (5th Cir. 1950);

*The Redwood,* 81 F.2d 680 (9th Cir. 1936). Here, I have made no such finding. I have found above that the substituted lights did not afford adequate warning; implicit in that finding is the conclusion that proper lights could have prevented the collision. Accordingly, I rule that the government's failure to possess proper lights does not excuse its leaving the hulk anchored with inadequate lights.

■ The government makes much of the fact that the barge MARGARET T was anchored in an area marked on the aforementioned chart as an anchorage area. In so claiming, the government appears to contend that the chart provided sufficient notice that vessels may be anchored in that area. The government, however, fails to recognize that the collision did not occur in the anchorage area but occurred in the adjacent fairway where it could not reasonably be expected that the plaintiffs would foresee the presence of an effectively unlit, anchored hulk. The fairway constitutes part of the navigable channel, and, as such, it is to be kept open and unobstructed. *The Oliver,* 22 F. 848 (E.D.Va.1885). Moreover, as established in Government Exhibit F— Enclosures 51 and 52—the Coast Guard did not recognize that anchorage area as either a legal or safe one. Testimony by the Harbor Police further established that rarely, if ever, did vessels anchor in that area because of the dangers presented to the fishing fleet leaving Gloucester Harbor. I rule, accordingly, that the marking on the applicable chart showing that there is an anchorage area is not sufficient notice of the fact that a vessel not showing the required lights was located improperly in an area adjacent to but beyond the anchorage area. *Compare Diamond State Telephone Co. v. Atlantic Refining Co.,* 205 F.2d 402, 407 (3d Cir. 1953).

In order to escape fault the government must show that the statutory violations did not contribute causally to the collision. *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874); *China Union Lines v. A. O. Andersen & Co.,* 364 F.2d 769 (5th Cir.

1966), *cert. denied,* 386 U.S. 933, 87 S.Ct. 955, 17 L.Ed.2d 805 (1967), *rehearing denied,* 390 U.S. 974, 88 S.Ct. 1015, 19 L.Ed.2d 1191 (1968); *Toney v. United States Corps of Engineers,* 397 F.Supp. 307 (M.D.La. 1975). The government contends that this collision was caused in part or in whole by the contributory negligence of the captain and crew of the BLUE WATERS. However, I find that this contention is without a factual foundation. It does not appear on the facts of this case that any action taken by the BLUE WATERS could have prevented the collision. Although the BLUE WATERS' speed was in excess of the posted speed limit, I found above that even a boat proceeding at a proper speed could not have avoided the collision. In addition, there is credible evidence that the proper lookouts were stationed and that they did not see the lights displayed. I rule that the actions of the BLUE WATERS did not contribute causally to the collision. The barge MARGARET T, lying, as she was, in a fairway without proper lights presented a hazard to navigation. Even if there were no statutory violation, the evidence adduced at trial established negligence under general maritime standards on the part of the government in anchoring the barge as it did. The government negligently performed a service on which a seagoing vessel relied to its detriment. *Zabala Clemente v. United States,* 567 F.2d 1140, 1150 n. 14 (1st Cir. 1977), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978). It follows, therefore, that the Coast Guard's failure to take the precautions clearly required by maritime law, under both statutory law and common law standards, was the sole and proximate cause of the collision.

As a result of the collision, the BLUE WATERS sustained extensive damage to her bow causing the BLUE WATERS to abort its scheduled trip to Boston and to proceed to the Coast Guard dock where the BLUE WATERS sank as a result of flooding in the bow. The BLUE WATERS was raised and sold for $15,000 by the insurance company which subrogated to Gaspar's title after paying him the $75,000 policy.

The general rule for fixing damages is to award a ship owner the amount of his actual loss. *The Baltimore,* 75 U.S. (8 Wall.) 377, 19 L.Ed. 463 (1869); *Rugo Construction Co. v. New England Foundation Co.,* 172 F.2d 964, 967 (1st Cir. 1949); *Clary Towing Co., Inc. v. Port Arthur Towing Co.,* 367 F.Supp. 6, 12 (E.D.Texas 1973). Thus, where a vessel sinks and "is obviously so badly damaged that the cost of repairing her will clearly exceed her value at the time she sank, the owner's recovery is limited to the fair value of the vessel at the time of the loss . . . ." *Rugo Construction Co. v. New England Foundation Co., supra.* Compare *Hewlett v. Barge Bertie, In Rem Evelyn,* 418 F.2d 654, 657 (4th Cir. 1969), *cert. denied,* 397 U.S. 1021, 90 S.Ct. 126, 25 L.Ed.2d 531 (1970); *O'Brien Bro. v. The Helen B. Moran,* 160 F.2d 502 (2d Cir. 1947). In the instant case the loss was not complete, repairs were physically practicable, but I find that repairs were not economically practicable because repair costs exceeded the value of the BLUE WATERS at the time of the collision. *Hewlett v. Barge Bertie, In Rem Evelyn, supra.*

One of plaintiffs' witnesses who had done repair work on the BLUE WATERS estimated that it would cost $85,000 to completely repair the BLUE WATERS. Testimony as to the value of the vessel at the time of the collision, as can be expected, was conflicting. One of plaintiffs' witnesses expressed the opinion that a willing buyer would pay $125,000. He based his valuation upon capital improvements which he had made on the BLUE WATERS and upon sales of allegedly comparable boats. He did not know, however, the sale price of any comparable former Navy mine sweeper which, like the BLUE WATERS, was built in 1941. I find that his knowledge was very limited. In particular, I find that, as to most of the vessels whose condition he knew he did not know the sales price, and that the vessels whose sale price he did know were not established to be comparable enough to the BLUE WATERS to be probative of the value of the BLUE WATERS.

Gaspar testified that he paid the City Oil Company $72,000 for the BLUE WATERS

back in 1946—a $37,500 mortgage and the balance was paid for by shares of City Oil Company. He testified that he had added to it the following: a fish finder at a cost of $4,500; combing or coving around the deck at a cost of $14,500; two lorans worth $2,895; an engine overhaul in 1976 which cost $11,000; and other small items totalling about $1,500. He expressed an opinion that the BLUE WATERS was worth about $150,000 because of the work he did, her construction, and the fact she was a good sea boat.

A final witness for the plaintiff testified that there was a $75,000 policy on the BLUE WATERS which his insurance company had paid to plaintiffs. He further testified to allegedly comparable sales of other vessels at $125,000, $150,000 and $90,000.

The government's one witness valued the BLUE WATERS at between $50,000 and $62,000.

Considering all of the above, I find that the BLUE WATERS was worth approximately $75,000 at the time of the collision and that value did not exceed repair costs. Therefore, plaintiffs are entitled to recover the fair value of their vessel, $75,000, as well as the costs of raising and removing the vessel, *Rugo Construction Co. v. New England Foundation Co., supra*, at 968, which I find to be $8,000.

In addition, plaintiffs are entitled to the fair market value for the catch of fish which was aboard the BLUE WATERS and which had to be taken to the dump and covered with lime and gravel after the BLUE WATERS was raised. I find, on the basis of the testimony of Gaspar and his brother Carlos, the fish hold man on the BLUE WATERS, that there were 55,000 pounds of fish aboard the BLUE WATERS at the time of the collision and that the entire catch was lost. Gaspar claimed the catch was worth between $18,000 and $20,000. His brother Carlos estimated the market value to be between $20,000 and $22,000. The government witness, a representative from the Market Branch of the National Marine Fisheries Service, testified to

a calculation based on prices paid for catches at the New England Fish Exchange on August 30, 1976 which showed a substantially lower dollar value for the catch. On the basis of all of the above, I find the catch was worth $16,100 and rule that plaintiffs are so entitled to recover for the lost catch as well as the cost to bury the fish, $2,600.

In addition, I rule that the personal property of the crew, valued at $1,300, is properly recoverable. *The Niagra,* 77 F. 329, 336 (S.D.N.Y.1896), *aff'd* 84 F. 902 (2d Cir. 1898).

Accordingly, a decree is entered awarding the plaintiffs damages of $103,000.

■ The government has counterclaimed under 33 U.S.C.A. § 1321 for clean-up costs resulting from oil discharged by the BLUE WATERS into Gloucester Harbor. Having ruled that the collision was caused solely and proximately by the negligence of the United States, I further rule that the oil spill from the vessel damaged in that collision was likewise caused solely by negligence on the part of the United States. It follows, therefore, that the United States is not entitled to clean-up costs, 33 U.S.C.A. § 1321(f)(1), or to any statutory penalty, 33 U.S.C.A. § 1321(b)(6).

Order entered accordingly.